IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:05-CR-71 |
| | ) | (JARVIS/GUYTON) |
| DANIEL ALFORD, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This matter is before the Court pursuant to defendant, Daniel Alford's Motion to Suppress [Doc. 16] regarding the seizure of two plastic bags and cash, and the defendant's Motion to Suppress Statement [Doc. 17], regarding the defendant's admission that he was in possession of powder cocaine. All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. An evidentiary hearing was held on January 4, 2006. Assistant United States Attorney Tracee Plowell was present representing the government. Attorney James W. Bell was present representing the defendant, Daniel Alford. The defendant was also present. The defendant, Daniel Alford ("Alford") has been indicted [Doc. 2] on one (1) count of possession with intent to distribute cocaine base ("crack"), a Schedule II controlled substance, a violation of 21 U.S.C. § 841. This charge arises out of the seizure of certain items, namely a clear plastic bag of powder cocaine, a clear plastic bag of crack, and cash, which were found in a car being driven by Alford. Just prior to the seizure of these items, Detective Christopher

1

Bell ("Bell") of the Knoxville Police Department ("KPD") had pulled over Alford's car and then arrested Alford for driving without having a valid driver's license. Bell also alleges that after Alford was arrested, Alford admitted to possession of the powder cocaine found in the car, while denying possession of the crack cocaine.

Alford has moved to suppress all items of evidence seized, alleging that Bell needed, but lacked, "probable cause" to pull over Alford's car in the first place, and therefore, the items seized after the vehicle stop were obtained in violation of his Fourth Amendment rights, and also that the search of the car was not made incident to arrest, and further, that the items seized were not in plain view. [Doc. 16]. As to the alleged admission by Alford of drug possession, Alford argues that he did not waive his right against self-incrimination and that Bell did not properly give the Miranda warnings. [Doc. 17]. In response, the government alleges that under either a "reasonable suspicion" standard or the higher "probable cause" standard, Bell had adequate grounds to believe that Alford was committing a traffic offense, driving without a valid license, when Bell pulled over Alford's vehicle. The government's position is that once Bell made a legitimate stop of Alford's vehicle, that Bell then had the right to arrest Alford, and then seize the plastic bags from the front seat area of the car, where they were in plain view, pursuant to a standard search incident to arrest. The cash, according to the government, was recovered during the post-arrest pat-down of the defendant.

## I. FACTS

At the evidentiary hearing on these motions, the government called Bell as its only witness. Bell testified that he is a detective with the KPD, holding the rank of Police Officer III.

2

He testified that he has been with the KPD for thirteen (13) years, and that currently he is an investigator with the Major Crimes Unit. Bell testified that he has made or assisted in thousands of arrests during his career, approximately 70% of which involved narcotics.

Bell testified that on the evening of July 1, 2005, he was working as a privately paid security guard at Malibu 7, a club located on Martin Luther King Boulevard ("MLK") in Knoxville. Bell testified that he was wearing his KPD uniform and that he was in a marked police car, both of which are KPD requirements for off-duty security work.

Bell testified that there was a video camera in the police car he was using. Bell identified Exhibit 1, the video from the police car.

Bell testified that at approximately 7:00 p.m., while working at Malibu 7, he saw Alford drive past his location. Bell said that Alford was behind the wheel of a Chevrolet Caprice four (4) door sedan, going west on MLK. Bell testified that he has known Alford for several years, and that he recognized him on sight. Bell said, in fact, that he had met with Alford at the police department several days prior to July 1, 2005, to discuss an unrelated case. Based on information that he had learned about Alford during that meeting at the police department, Bell believed that Alford was driving without a valid driver's license. Therefore, Bell contacted NCIC to check the status of Alford's license. Bell testified that the NCIC operator advised that Alford's license was suspended for failure to pay a citation.

Bell testified that less than an hour later, Alford again drove past Bell's location. Bell pursued Alford in his police vehicle, and he initiated a traffic stop of Alford on MLK, about two (2) blocks away. Bell testified that he took Alford into custody immediately upon removing him from his vehicle. Bell testified that he placed Alford in handcuffs and put Alford in the back of his police

3

vehicle. Bell testified that he arrested Alford for driving without a license/suspended license. This was at approximately 7:50 p.m.

Then another KPD officer, Huckleby, did a preliminary search of the driver's compartment of Alford's vehicle. Bell testified that this was a search incident to the arrest of Alford. According to Bell, Huckleby saw two (2) clear baggies in plain view in the middle of the front seat of Alford's vehicle, one containing white powder and the other containing rock-like objects. Bell testified that he then stood at the window of the vehicle and looked in the vehicle and saw in plain view on the car seat the two (2) clear baggies. Bell testified that he first intended to leave the baggies on the seat of the car so that photographs could be taken of them. However, he said that he soon decided to just put the baggies on the hood of the car in view of the police video camera.

Bell made an in-court identification of Alford as the person he took into custody. Bell also testified that he searched Alford after removing him from the vehicle and found two hundred thirty ($230) dollars in cash on Alford's person. Bell testified that the cash consisted mostly of twenty ($20) dollar bills.

Bell testified that some personal items were then removed from Alford's vehicle, at Alford's request, and given to Alford's family members. Alford's vehicle was then towed to impound. Bell transported Alford back to the Malibu 7 in Bell's police vehicle. Then, Bell completed arrest paperwork while waiting for the transport wagon to arrive for Alford.

Bell testified that he gave Alford the <u>Miranda</u> rights at the scene of the traffic stop. Bell said that he gave him the rights by memory and not by reading from a card. Bell testified that Alford then made the statement that the powder cocaine was in his possession, but that the crack cocaine was not in his possession. Bell testified that Alford was not threatened or coerced in any

4

way into making a statement. Bell said that Alford appeared to understand his rights. The police video, Exhibit 1, was played in Court. It showed that Bell did advise Alford of his Miranda rights. Specifically, Bell advised Alford that he had the right to remain silent; that anything Alford said could and would be used against him in a court of law; that Alford had the right to talk to a lawyer and have one present with him when he was being questioned; that if Alford could not afford a lawyer, one would be appointed to represent him at no cost; and if at any time Alford decided to exercise any these rights and not answer any questions or make any statements, he had the right to do so. Bell then said: "Do you understand your rights?" Any response to that question, however, was not audible on the video, and Bell testified that he did not recall what Alford said in response to the question. Bell did testify that Alford appeared "alert" when he made the statement about being in possession of cocaine, and that Bell had no trouble understanding him. Bell noted that Alford also was read his rights several days before when he was at the police station, after which he agreed to speak with officers. Bell testified that Alford:

> "knows me and if Daniel had any questions, he would have asked me.
> We have conversations back and forth between each other. He is not
> scared of me. He doesn't hesitate to talk to me. If he had a question,
> I am positive he would have asked me."

The NCIC report was then marked as Exhibit 2. That document shows that Bell made a check on Alford's license on July 1, 2005, and that Alford's license was suspended.

On cross examination, Bell testified that he ran the license check on Alford before he initiated the traffic stop to confirm that his license was suspended. Bell explained that after he stopped Alford and placed him under arrest, Bell made a second call to NCIC. This call occurred at approximately 8:30 p.m. He testified that the purpose of that call was to see how many times Alford's license had been suspended to clarify what charge Bell would place on the arrest warrant.

5

With regard to his first call to NCIC, Bell again testified that he was told that Alford's license was suspended for failure to satisfy a court citation. Bell testified that he interpreted that information to mean that Alford did not have a valid driver's license.

Bell testified that when he approached Alford's vehicle after pulling it over, Bell had his gun drawn and to his side for caution. Bell testified that the defendant made no suspicious movements while still in the defendant's vehicle. Bell immediately removed Alford from the car, and Bell testified that Alford was under arrest, for driving with a suspended license, as soon as Bell removed him from his vehicle. Bell again testified that the two clear plastic baggies were in the middle of the front bench seat and in plain view. Bell testified that he did not look at the seat when first removing the defendant from the car, but that he did go back and look at the seat after Officer Huckleby told him that there were baggies on the middle of the front seat, which was a bench type seat.

Bell testified that he gave the <u>Miranda</u> warnings to Alford only once. Bell testified that the admission about the possession of powder cocaine was made by Alford after Bell gave him the <u>Miranda</u> warnings. According to Bell, Alford also admitted to selling crack in the past, but Alford denied selling crack, or being in possession of crack, that day.

On redirect examination, Bell testified that he conducted one (1) continuous search of Alford's vehicle, not several independent searches. Bell testified that the entire vehicle was inventoried before being towed, pursuant to standard procedure.

On re-cross examination, Bell testified that his second call to the NCIC is not reflected on Exhibit 2, the NCIC log. Bell testified that he believes that this was because unit number 285 also made an NCIC call regarding Alford, and the dispatcher simply "went off" number

6

285's call when Bell made his call. Bell testified that his unit number is 221, not 285, and that the police video tape reflects that he spoke with the NCIC operator using that number after Alford's arrest.

## II. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer. United States v. Ferguson, 8 F.3d 385, 388 (6th Cir. 1993). If "the officer had probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." Id. at 391.

The defendant questions whether Bell had probable cause to believe the defendant was driving on a suspended license. He argues that Bell's second call to NCIC, which occurred after the stop, indicates that Bell did not have grounds to make the stop. The defendant also questions whether the plastic baggies really were in plain view on the front seat of the vehicle. He argues that Bell made several searches of the vehicle before the baggies were removed from the car and placed on the hood. Finally, the defendant argues that Bell did not confirm that Alford fully understood his Miranda rights, and therefore the admission of drug possession by Alford must be suppressed.

The government argues that based upon Bell's recent experience and knowledge of Alford, and his call to NCIC, Detective Bell had probable cause to believe that the defendant was driving without a valid license. Accordingly, the government states, the arrest was proper, and the

7

search of the vehicle and of Alford's person were valid as a search incident to arrest.

Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). The Sixth Circuit examined in detail the showing necessary to establish probable cause in United States v. Barrett:

> The establishment of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 244 n.13, 103 S. Ct. 2317, 2335 n.13, 76 L. Ed. 2d 527 (1983). As noted in Texas v. Brown, 460 U.S. 730, 742, 103 S. Ct. 1535, 1543, 75 L. Ed. 2d 502 (1983):
>
>> [P]robable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief" ... that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. (citations omitted).
>
> Moreover, the existence of probable cause should be determined on the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed .2d 527 (1983). This totality of the circumstances analysis includes a realistic assessment of the situation from a law enforcement officer's perspective.

890 F.2d 855, 861 (6th Cir. 1989), superseded on other grounds by 18 U.S.C. § 3742(e); see also Ferguson, 8 F.3d at 392 (also quoting this passage from Barrett).

The Court finds that the testimony of Bell is not contradicted or impeached, and therefore, is credible. The Court finds that Bell had reason to suspect that Alford was driving without a valid license. Acting on this reasonable suspicion, Bell called NCIC to investigate before he stopped Alford. The NCIC operator confirmed to Bell that Alford did not have a valid license, due to Alford's failure to pay court ordered citations. Even though this information gave Bell

8

probable cause to arrest Alford for driving on a suspended license, Bell did not go looking for Alford. Rather, Alford, in effect, came to Bell by driving past him less than an hour after Bell's call to NCIC. Bell's decision at that point to make a stop and arrest Alford was reasonable and legally valid.

Because Bell properly stopped the defendant based upon probable cause, he could arrest the defendant for the offense of driving on a suspended license and place the defendant in the patrol car. At that point, Bell could search the interior of the defendant's car incident to the custodial arrest. See New York v. Belton, 453 U.S. 454, 460 (1981). The fact that the defendant was already under arrest, or handcuffed in the patrol car, at the time that Bell, or Huckleby, searched the front seat area where the plastic baggies were found does not affect the propriety of the search. See United States v. White, 871 F.2d 41, 44 (6th Cir. 1989).

Furthermore, the Court finds that the search was substantially contemporaneous with Alford's arrest. See Stoner v. California, 376 U.S. 483, 486 (1964) (holding that a search incident to an arrest must be "substantially contemporaneous with the arrest"); United States v. Barnett, 407 F.2d 1114, 1119-20 (6th Cir. 1969) (holding search incident to arrest to be substantially contemporaneous although defendants may have departed the scene for the police station minutes before the search). Finally, because the arrest of Alford was proper, the subsequent pat-down search of Alford's person, which yielded the cash, was also valid. See United States v. Robinson, 414 U.S. 218, 235 (1973). Thus, the Court finds no basis upon which the evidence of the two (2) plastic baggies and their contents, and the cash, should be suppressed.

The defendant also maintains that his statement about being in possession of cocaine was not voluntarily given. The government responds that the Miranda warnings were given and that

9

the defendant voluntarily agreed to speak with Bell.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966); see also United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." Stansbury v. California, 511 U.S. 318, 322 (1994); Salvo, 133 F.3d at 948.

Additionally, even when the Miranda warnings are administered, the government must prove that the defendant voluntarily, knowingly, and intelligently waived those Miranda rights before it may introduce an incriminating statement by a defendant. Colorado v. Connelly, 479 U.S. 157, 169-70 (1986). The government bears the burden of proving the voluntariness of the waiver by the preponderance of the evidence. Id. at 168.

### A. Presence of Miranda Warnings

The defendant's Motion [Doc. 17] alleges that he was not given adequate Miranda warnings while he was in custody, and further, that the defendant did not freely, voluntarily, and knowingly waive his privilege against self-incrimination. At the suppression hearing, the defendant argued that proper Miranda warnings were not given. Further, he argued that he remained silent when Bell asked him if he understood his rights, and therefore, Bell failed to confirm that Alford understood his rights.

Bell testified that he orally gave the Miranda rights to the defendant before questioning the defendant about the plastic baggies which appeared to contain drugs. Bell stated that the defendant appeared to understand his rights and was willing to talk with him. Bell testified that during his meeting with Alford several days prior at the police station, Alford was given the Miranda warnings and then waived his rights before speaking with Bell.

The Court finds that the testimony of Bell is credible and unimpeached. The video, Exhibit 1, clearly shows that Bell gave adequate Miranda warnings to Alford. The warning given must reasonably convey to the suspect his Miranda rights; no "precise formulation" or "talismanic incantation" is required. Duckworth v. Eagan, 492 U.S. 195, 202-03 (1989) (quoting California v. Prysock, 453 U.S. 355, 359 (1981)). Rather, the Court must simply determine whether the warning given to the suspect "touched all of the bases required by Miranda." Duckworth, 492 U.S. at 203.

The Court finds that Bell's warning to Alford reasonably conveyed his Miranda rights. Accordingly, the Court finds that Bell did give Alford adequate Miranda warnings before the statements and admissions in question.

### B. Voluntariness of Statements

In his brief, the defendant also states that the statements he made to Bell were not voluntarily given. The main thrust of Alford's argument appears to be that his statements were not voluntary, because he either (1) was not given the Miranda warnings or (2) he did not waive them. The Court has already rejected this first contention above. The Court will briefly examine the totality of the circumstances surrounding the July 1, 2005 statement to determine the voluntariness of the defendant's statement despite his receipt of his Miranda rights.

11

As noted above, the government must prove by a preponderance of the evidence that the defendant knowingly, voluntarily, and intelligently waived his Miranda rights in order to use the defendant's statement at trial. Connelly, 479 U.S. at 169-70. To determine whether a confession was voluntary, the Court must examine the following factors in light of the totality of the circumstances: (1) whether the police conduct was objectively coercive, (2) whether the coercive police conduct was sufficient to overbear the defendant's will when viewed subjectively from the defendant's state of mind, and (3) whether the coercive police conduct was in fact the cause of the defendant's will being overborne. McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Id. at 167. "If the police misconduct at issue was not the 'crucial motivating factor' behind [defendant's] decision to confess, the confession may not be suppressed." McCall, 863 F.2d at 459 (citing Connelly, 479 U.S. at 163-64).

In the present case, the defendant does not allege any coercive police conduct. Although the statement was given while the defendant was under arrest, in custody, and in a police vehicle, no guns were drawn. The video tape indicates that Bell spoke somewhat casually to Alford. There is no evidence of raised voices, threats, or intimidation. Bell's testimony that he and Alford knew each other, and in fact, had recently before this arrest spoken at police headquarters is credible and persuasive. The Court finds that there was no evidence of police misconduct and that Alford knew his rights, and that he voluntarily agreed to discuss the two plastic baggies and the presence of drugs with Bell. A waiver of Miranda rights does not have to be in writing in order to establish that the waiver was knowing and voluntary. United States v. Miggins, 302 F.3d 384, 397 (6th Cir.),

12

cert. denied, 537 U.S. 1097 (2002). In summary, the Court finds that the defendant's statements in question were voluntarily given, after defendant was given the Miranda warnings. Therefore, the Court finds no reason to suppress the statements made by Alford to Bell.

## III. CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing, and after reviewing the relevant legal authorities, it is clear that there is no basis to suppress any evidence seized in this case, or to suppress the statements made by the defendant after he was given the Miranda warnings. For the reasons set forth herein, it is **RECOMMENDED** that defendant's Motion to Suppress Evidence [Doc. 16] and the defendant's Motion to Suppress Statement [Doc. 17] be **DENIED.**[1]

Respectfully submitted,

    s/ H. Bruce Guyton
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).